UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| REBECCA YOUNG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:09-CV-37 |
| ) | (GUYTON) |
| MARYVILLE HOUSING AUTHORITY, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 17]. This matter came before the Court for a hearing on June 4, 2009, to address the Plaintiff's Motion for Injunctive Relief [Doc. 4]. Attorney John Eldridge and Attorney Kendra Mansur were present representing the Plaintiff, who was also present. Attorney Norman Newton, Attorney Sarah Larkin, and Attorney John Batson were presenting representing the Maryville Housing Authority, Joyce Baker, and Sandra Black.

The Court heard the arguments of the parties on the motion and received testimony from the Plaintiff. At the conclusion of the hearing, the parties made an oral motion for leave to file briefs supplementing the testimony and arguments presented at the hearing. The Court granted the oral motion, and the Plaintiff filed her supplemental brief on June 12, 2009. The Defendants filed a responsive supplemental brief on June 18, 2009. Accordingly, the Motion for Injunctive Relief was ripe for adjudication on June 19, 2009, and the Court took the matter under consideration on that date.

**I.     POSITIONS OF THE PARTIES**

Until July of 2008, the Plaintiff received a federal housing voucher through the Maryville Housing Authority, which subsidized her rent because of her low income. The housing authority terminated the Plaintiff's voucher based on a belief that she had violated pertinent regulations by engaging in a physical altercation with the current wife of the father of one of her two children. The Plaintiff alleges numerous violations of the regulations and constitutional protections that are applicable to the termination process for such subsidies. Based upon these violations, she prays for reinstatement of her voucher, damages, and costs. [Doc. 3]. In addition, the Plaintiff seeks a preliminary injunction reinstating her voucher to subsidize her rent until this matter proceeds to trial in early November. [Docs. 4, 22, and 31]. The Plaintiff maintains that without an injunction she and her two young children will likely be rendered homeless.

The Defendant opposes the request for an injunction and alleges that the Plaintiff has failed to meet any of the criteria for an injunctive relief. [Doc. 14, 20, and 28].

**II.    FACTS**

On July 22, 2004, Plaintiff Rebecca Young applied to the Maryville Housing Authority ("MHA") for a housing voucher pursuant to Section 8 ("Section 8") of the Housing and Community Development Act of 1974. Section 8 is a program established by Congress in 1974, as an alternative to traditional government-owned housing projects, see 42 U.S.C. § 1374f(o). To receive rental assistance pursuant to the program, low income families apply to their local housing authority. 24 C.F.R. § 982.1. If approved, the housing authority will determine the appropriate rental subsidy for the family. Id. Upon finding a suitable rental unit in the private housing market, the family may enter into a lease for that property, and the housing authority will contract with the owner to subsidize the monthly rent. Id. In the spring of 2007, the Plaintiff's Section 8 application was

approved, and on May 10, 2007, she moved into an MHA-approved dwelling at 906 Doll Avenue in Maryville, Tennessee.

On May 3, 2008, the Plaintiff's older child, three-year-old Olivia, was visiting her father William Paez ("Mr. Paez"), at his home at 718 Front Street in Maryville, Tennessee, pursuant to a co-parenting plan. According to the Plaintiff, she drove by the home at about 11:00 p.m. because she was apprehensive about the visit, and the Plaintiff says she found Olivia outside in the yard without supervision. The Plaintiff testified that she was invited in the yard by Mr. Paez, but was then attacked by Ashley Paez ("Mrs. Paez"), who struck her in the face with a flashlight. [Doc. 29 at 11]. The Plaintiff admitted that she attempted to defend herself against Mrs. Paez. [Doc. 29 at 11]. Thereafter, the Maryville Police Department was called.

In his rendition of the facts, responding officer Carl Latham ("Officer Latham") of the Maryville Police Department found the Plaintiff to be the aggressor. [Doc. 3-1 at 37]. In the Incident Report, Officer Latham indicated that the Plaintiff was arrested the same night and listed two charges: simple assault and criminal trespass.[1] However, consistent with the Plaintiff's testimony to this Court, the Incident Report's narrative section notes that Mrs. Paez obtained an assault warrant after the altercation. [Doc. 31 at 37].

In the spring of 2008, the Plaintiff's employment status also changed and, accordingly, the MHA decreased her rent subsidy. However, the Plaintiff soon left the new position because of childcare conflicts. The Plaintiff called the MHA to update the authority on this change in her

---

[1]The Incident Report submitted to the Court lists two charges, simple assault and criminal trespass. [Doc. 3-1 at 37]. The arrest warrants sworn out on May 3, 2008, include a warrant for criminal trespass pursuant to Tennessee Code Annotated § 39-14-405, harassment pursuant to Tennessee Code Annotated §39-17-308, and assault pursuant to Tennessee Code Annotated § 39-13-101. [Doc. 3-1 at 38-43]. All charges eventually were dismissed, and the court costs on the assault charge were taxed to the Plaintiff. [Doc. 3-1 at 43, Doc. 29 at 48].

3

employment status. The Plaintiff spoke to Sandra Black ("Ms. Black"), the MHA's Section 8 specialist. Ms. Black stated that the MHA would not recalcuate the Plaintiff's subsidy until after it evaluated whether the Plaintiff would be allowed to keep her voucher.

On June 12, 2008, Ms. Black composed a letter informing the Plaintiff that the MHA was terminating her voucher. The letter noted that the reasons for termination were "Program violations- See attached." [Doc. 3-1 at 31]. Ms. Black attached a copy of the "Family Obligations" Form, which the Plaintiff had previously signed to confirm that she was informed of the rules and obligations she was expected to comply with in order to continue to receive her subsidy. [Doc. 3-1 at 32-33]. On the copy she attached, Ms. Black had highlighted the following provision:

> [A tenant may not] . . . [e]ngage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.

[Doc. 3-1 at 33]. The letter informed the Plaintiff that she had a right to appeal the decision within ten days.

Accordingly, the Plaintiff requested a hearing to appeal the decision, and a hearing was held on June 17, 2008. The Plaintiff, Ms. Black, and Maryville Police Department Captain John McCulloch ("Capt. McCulloch") were present at the hearing. Capt. McCulloch acted as the hearing officer. According to Capt. McCulloch's memorandum of the hearing and his decision [Doc. 12-1], at the hearing, Ms. Black informed Capt. McCulloch that the Plaintiff's subsidy had been terminated after Ms. Black learned that Ms. Young had been arrested for assault. Ms. Black stated that the program strictly prohibited violent criminal conduct by benefit recipients. The Plaintiff then stated her version of the incident with Mrs. Paez, which Capt. McCulloch summarized as follows:

> Ms. Young agreed that she had been arrested for assault. Her rendition of the events leading up to the arrest differed from the narrative in the arrest report. She claimed that she was the initial

4

> victim of an assault that occurred at her ex-husband's residence and
> was initiated by her ex-husband's current wife.

[Doc. 12-1 at 1].

After hearing from Ms. Black and the Plaintiff, Capt. McCulloch felt, "compelled to rely on the narrative in the arrest report to determine the events that occurred leading up to the arrest." [Doc. 12-1 at 1]. Capt. McCulloch briefly summarized these facts, and found that "[a]ll information leading to this point suggests Ms. Young initiated the contact and actions that resulted from the contact." [Doc. 12-1 at 1]. Capt. McColloch affirmed the decision of the MHA in his memorandum of decision dated June 17, 2008, and on June 19, 2009, the MHA sent the Plaintiff a notice stating that the decision to terminate her voucher had been affirmed and informing the Plaintiff that her assistance would terminate on July 13, 2008. [Doc. 12-2 at 1].

The Plaintiff vacated the home at 906 Doll Avenue some time in the second half of 2008 because she was unable to pay the rent. [Doc. 29 at 16]. She moved into the residence next door at 908 Doll Avenue, with a friend Joe Nelson ("Mr. Nelson"). [Doc. 29 at 29-30]. Mr. Nelson moved out in March of 2009, and the Plaintiff and her children now reside at 908 Doll Avenue alone. David Hill ("Mr. Hill") has been the Plaintiff's landlord at both 906 Doll Avenue and 908 Doll Avenue. [Doc. 3-1 at 31, Doc. 29 at 31]. The Plaintiff explained that Mr. Hill has allowed her to stay at the property at 908 Doll Street on a month-to-month basis and that he has been "lenient" in enforcing her rent obligations, including one thousand dollars she owes him in back rent, pending the outcome of this matter. [Doc. 29 at 31-32].

The Plaintiff testified at the hearing before this Court that she earns approximately three hundred dollars a month at her current job and receives approximately five hundred dollars in food stamps from the department of human services per month. The Plaintiff has two children who are currently two and five years of age. The father of one of the Plaintiff's children has left the country

5

and pays no child support. Mr. Paez, the other father, is in significant arrears on his obligations and has, on more than one occasion, served jail time for his failure to meet these obligations. However, the Plaintiff admitted that she occasionally receives payments from Mr. Paez—for example, the sixty-six dollar payment he made to the Plaintiff in early May. In sum, the Plaintiff testified that given her current employment status and income, she cannot pay the full rent obligation at 908 Doll Avenue, which is approximately five hundred eight-five dollars per month.

The Plaintiff testified that her mother and father are currently helping pay her rent and have been doing so for the past three months. [Doc. 29 at 18]. The Plaintiff stated that she cannot live with her parents because they have a small two-bedroom home, which does not have room for her and her children. [Doc. 29 at 18]. The Plaintiff explained that her mother has no income and her father receives disability benefits from the Social Security Administration. [Doc. 29 at 19]. The Plaintiff testified that her parents will not be able to pay her rent for long. [Doc. 29 at 19, 21]. The Plaintiff testified that she has looked for other housing in the community, but cannot find housing with a cheaper rent payment that she could afford. [Doc. 29 at 7]. The Plaintiff stated that after her parents' help ran out she would "have to beg someone to let [her] stay with them." [Doc. 29 at 21].

Finally, the MHA's Section 8 voucher program is currently underfunded, and as of June 2, 2009, the waiting list for receiving a voucher through the program included over one-thousand three hundred and eighty-one applicants. [Doc. 20-1 at 2]. The MHA maintains that it is wholly incapable of providing assistance to any additional participants, and it has put a hold on issuing vouchers due to budgetary constraints. [Doc. 20-1 at 2].

### III. ANALYSIS

When considering a motion for preliminary injunction, a court must consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would

6

suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. Tumblebus Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir. 2005). The four considerations are "factors to be balanced, not prerequisites that must be met." Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003) (citing In re DeLorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985)). The judge "is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." Id.

**A.      Likelihood of Success on the Merits**

Looking at the first of these factors, the Court finds that courts, including the Court of Appeals for the Sixth Circuit, have been inconsistent in describing the threshold showing required under the likelihood of success prong. Contra Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson County, Tenn., 274 F.3d 377, 400 (6th Cir. 2001) (noting only that the court is to consider "the plaintiff's likelihood of success on the merits") and Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 541 (6th Cir. 2007) (explaining that the court is to determine "whether Plaintiff has met the first [factor] by demonstrating a substantial likelihood of success on the merits of his underlying diversity action.") with Tumblebus, 399 F.3d at 760 (noting that a court is to consider "whether the movant has a strong likelihood of success on the merits"); see also 11A C. Wright, A. Miller & M. Kane, Fed. Prac. & Proc. Civ. 2d § 2943.3 (2009) ("The courts use a bewildering variety of formulations of the need for showing some likelihood of success—the most common being that plaintiff must demonstrate a reasonable probability of success. But the verbal differences do not seem to reflect substantive disagreement. All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")

7

After examining differing statements of the standard, the Court finds that use of the "substantial likelihood" standard appropriately captures the necessity of establishing a prima facie case without requiring an unduly high likelihood of success at trial.

In the instant matter, the Court finds that the Plaintiff has demonstrated a substantial likelihood of success on the merits of her claim, because she has demonstrated a number of procedural and substantive deficiencies in the termination of her Section 8 benefits. In making this determination, the Court has examined the regulatory scheme adopted by the Department of Housing and Urban Development ("HUD") to implement the Section 8 program. The regulations governing termination of benefits and delineating the procedural rights to be afforded to a beneficiary during the termination process are found at 24 C.F.R. § 982.551 to § 982.555 (2008).

Subsection 982.552(c) lists the eleven grounds for termination of benefits including violation of the family obligations of the program contained in § 982.551. Subsection 982.551(l) contains the family obligation relating to crime by household members and states "The members of the household may not engage in drug-related criminal activity or violent criminal activity or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises . . . ." Termination based upon criminal activity is permissible where the housing authority finds, "based on a preponderance of the evidence, that the household member has engaged in the activity, regardless of whether the household member has been arrested or convicted for such activity." 24 C.F.R. § 982.553.

The notice provided to the Plaintiff indicated, through its highlighting, that § 982.551(l) was the obligation under which the Plaintiff's subsidy was being terminated. [See Doc. 3-1 at 33]. The Plaintiff alleges a number of errors in her termination and, while the Court does not herein make a final determination of the merits of these claims, the Court nonetheless finds that the Plaintiff has

8

a substantial likelihood of successfully proving a number of the deficiencies in the termination process that she has alleged.

*1.    Insufficient Notice*

Subsection 982.555(c) enumerates the notice that must be given to a family participating in the Title 8 program prior to a termination hearing. The type of notice that is required varies depending upon the reason for termination. In this case, the MHA indicated to the Plaintiff that it was terminating her benefits because of violations of §982.551, the family obligations. Accordingly, the Plaintiff was entitled to written notice of the MHA's decision.[2] This notice is required to: "(i) Contain a brief statement of reasons for the decision, (ii) State that if the family does not agree with the decision, the family may request an informal hearing on the decision, and (iii) State the deadline for the family to request an informal hearing." § 982.555(c)(2).

The notice in this case fulfilled both of the latter criteria. However, the sufficiency of the "brief statement" given to the Plaintiff is very likely deficient. The entire paragraph addressing criminal behavior was highlighted in the attachment to the notice to the Plaintiff. Thus, the notice informed the Plaintiff that her termination could be based upon any of three broad categories of behavior: violent crime, drug-related crime, or crime near her residence.

The Court acknowledges that other courts have held that a Section 8 termination hearing notice is not required to specify the individual alleged to have committed the illegal activity or to specify the time that the activity took place. Ervin v. Housing Auth. of Birmingham Dist., 281 Fed.

---

[2]Subsection 982.555(c)(2), requires that "[i]n the cases described in paragraphs (a)(1)(iv), (v) and (vi) of this section, the PHA must give the family prompt written notice that the family may request a hearing." Paragraph (a)(1)(v) addresses a "determination to terminate assistance for a participant family because of the family's action or failure to act (see § 982.552)." The Plaintiff's benefits in this case were terminated, pursuant to § 982.552(c)(1)(i), for violation of the family obligation contained in § 982.551(l).

9

App'x. 938, 941 (11th Cir. 2008). Nonetheless, a notice that merely parrots the broad language of applicable regulations is insufficient. Billington v. Underwood, 613 F.2d 91, 94 (5th Cir. 1980); see also Bouie v. New Jersey Dept. Of Comm. Affairs, 2009 WL 1543838, at *7 (holding statement that "tenant cause[d] repairs" were the basis for termination to be insufficient under § 982.555(c) because it merely parroted 24 C.F.R. § 982.404(b)(I)). However, a number of courts have held that a proper notice, which complies "with the regulations[,] would state the particular felony and the person who allegedly committed it, and would give a brief factual statement concerning the incident." Edgecomb v. Housing Auth. of Town of Vernon, 824 F. Supp. 312, 315 (D. Conn. 1993); Brantley v. West Valley City Housing Auth., 2009 WL 301820, at *4 (D. Utah 2009).

Even relying upon the lower standards articulated by a number of courts, the notice given to the Plaintiff in this case did not isolate an individual who committed the violation, nor supply any facts about the violation–when it was alleged to have taken place, where it was alleged to have taken place, etc. While these facts would have been useful to the Plaintiff as she prepared to dispute the decision to terminate her benefits, the Court agrees with other courts that have examined the issue in finding that, due to the minimal threshold of information required by the regulation, the absence of such information does not make the notice insufficient. Ervin, 281 Fed. Appx. at 941. Nonetheless, the MHA's failure to isolate a specific charge, such as assault or trespass, or to even isolate a particular category of crime almost certainly fell below the statutory threshold of notice. The notice given to the Plaintiff simply "parroted" the statute, as it merely highlighted what was an almost verbatim rendition of the statutory language, and it gave the Plaintiff only the vaguest notice of the reason for the decision—i.e. that she had committed either a violent crime, a drug-related crime, or a crime near her residence. Such vague notice almost certainly fails to meet the statutory requirements.

Based on the foregoing, the Court finds that the Plaintiff has demonstrated a substantial likelihood of success on the merits of her first cause of action, which alleges that the Defendants denied her due process of law by failing to give proper notice of the basis for terminating her Section 8 benefits.

*2.    Absence of Violent Criminal Activity*

Looking more closely at the three grounds for termination under § 982.551(l), the Defendants have conceded and the Court finds that the Plaintiff's behavior did not interfere with other residents nor did it take place in the immediate vicinity of the premises; further, the alleged activity was not drug-related. Thus, the only grounds for termination remaining in § 982.551(l) is "violent criminal activity." HUD's definition of violent crime is "any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force substantial enough to cause, or be reasonably likely to cause, serious bodily injury or property damage." See 24 C.F.R. § 982.4(a)(2) (directing to definition contained in part 5, subpart A of the title: 24 C.F.R. § 5.100).

In contrast to the HUD definition, the Plaintiff was charged with assault under Tennessee Code Annotated § 39-13-101, which includes the element of bodily injury to another, but does not include *serious* bodily injury to another as an element. The Plaintiff was not charged with aggravated assault under Tennessee Code Annotated § 39-13-102, which does include the element of *serious* bodily injury to another. While a charge under Tennessee Code Annotated § 39-13-102 would fulfill the definition of violent crime applicable to HUD regulations, including Section 8, a charge under Tennessee Code Annotated § 39-13-101 does not contain the serious bodily injury element that is essential to finding the presence of violent crime under the applicable HUD definition.

11

The absence of the serious bodily injury element in the charged crime substantially undermines the MHA's decision, because it and Capt. McCulloch, relied exclusively on the responding officer's report and charging document, without gathering other information. Thus, it appears to the Court that an essential element of violent crime, as it is defined in applicable HUD regulations, was never established and cannot be established by the evidence relied upon by the MHA and Capt. McCulloch. Based on the foregoing, the Court finds that there is a substantial likelihood that the Plaintiff can be successful at trial on the merits of her fourth cause of action, which alleges that the Defendants denied the Plaintiff due process of law by terminating her voucher based upon activity that was not prohibited.

*3.     Reliance on Hearsay Evidence*

The Plaintiff also alleges that she was denied due process because Capt. McCulloch relied heavily on hearsay evidence, and she was, thereby, denied the opportunity to confront the witnesses that supplied evidence against her. As the United States Supreme Court instructed in Goldberg v. Kelly, 397 U.S. 254 (1970), a recipient of benefits must have "an effective opportunity to defend [his or her entitlement to such benefits] by confronting any adverse witnesses and by presenting his [or her] own argument and evidence orally," at the informal termination hearing. Id. at 268.

The rules of evidence are not applicable in administrative hearings, Ileana v. I.N.S., 106 Fed. Appx. 349, 353-54 (6th Cir. 2004), and hearsay evidence may be considered in such hearings, see Myers v. Sec'y of Health & Human Servs., 893 F.2d 840, 846 (6th Cir. 1990) ("Hearsay evidence is admissible in an administrative proceeding, provided it is relevant and material."). The Eleventh Circuit recently considered the evidentiary value of hearsay and the constitutional implications of relying exclusively on such evidence in Section 8 cases. In Ervin v. Housing Auth. of Birmingham Dist., 281 Fed. Appx. 938, 941 (11th Cir. 2008), the hearing officer relied on the testimony of the

12

housing authority assistant manager, testimony that was based upon and essentially reiterated the contents of the police report. Id. at 942. Although the court in Ervin acknowledged that hearsay is admissible in administrative hearings, it concluded that "the evidence supporting the adverse administrative decision wholly consisted of hearsay." Id. The court noted that such evidence can constitute substantial evidence, but concluded that the reliability and probability of the evidence presented necessitated remand. Id.

The Court has also considered Litsey v. Housing Auth. Of Bardstown, 1999 WL 33604017, at *6 (W.D. Ky. 1999), a decision from a district court within the Sixth Circuit which addresses Section 8 vouchers. In Litsey, the court found that the hearing officer considered information supplied by the beneficiary's landlord to be "essential to its decision to terminate." Id. However, the beneficiary was not allowed to question the landlord. Id. The court in Litsey concluded that applicable regulations require that the beneficiary be allowed to cross-examine such a party. Id.

In the present case, Capt. McCulloch appears to have relied almost exclusively on the contents of the report of responding officer, Carl Latham. While it is "well-established that police reports are hearsay," United States v. Ott, 229 F.3d 1155, at *5 (6th Cir. 2000) (Table), as stated above, reliance on such reports is not altogether precluded in administrative hearings. However, in the instant case, the narrative contained in the report consists entirely of Officer Latham's summary and reiteration of statements made by the Plaintiff and Ms. Paez. Thus, the report consisted of double hearsay, in that the Plaintiff at her hearing was first denied the opportunity to cross-examine Officer Latham and was also denied the opportunity to cross-examine the source, Mrs. Paez, that Officer Latham relied upon at the scene.

Thus the Court finds that the Plaintiff was denied the opportunity to cross-examine Officer Latham and Mrs. Paez, the two sources who through the statements attributed to them in the police

13

report supplied the entirety of the evidence relied upon by Capt. McCulloch. Accordingly, the Court finds that the Plaintiff has a substantial likelihood of successfully proving the merits of her eighth cause of action, which alleges that she was denied due process by being prevented from cross-examining witnesses.

*4.     Lack of Substantive Evidence to Support the Hearing Officer's Decision*

Finally, the Court has examined the evidence presented to Capt. McCulloch and the MHA, and the Court finds that there is a substantial likelihood that the decision did not rely on sufficient evidence and that the lack of evidence was egregious enough to render the decision arbitrary and, thus, a violation of federal regulations and the Plaintiff's rights. The Court finds that the Plaintiff is likely to be successful in proving that violations of her right to present evidence and her right to be terminated only where the decision against her is supported by substantial evidence.

The Court again looks to the court's analysis in Litsey, 1999 WL 33604017. In Litsey, the court found that the hearing officer's decision summarily dismissed the evidence presented by the plaintiff and grossly misstated the evidence presented by the housing authority. Id. at *5-*6. The hearing officer relied on a postal service statement that the beneficiary's boyfriend received mail at the beneficiary's address, without giving any credit to the beneficiary's rebuttal. Id. at *6. Further, the Officer found the postal evidence and complaints by neighbors about disturbances to support, what was at best an inference, that the beneficiary's boyfriend was residing with her, in violation of the Section 8 family obligations. Id.

The Court finds that the evidence before it could support a finding that the MHA failed to follow applicable federal regulations by similarly discounting the Plaintiff's statements about the underlying incident with Mrs. Paez. It is undisputed that the only witness at the hearing with first-hand knowledge of the incident was the Plaintiff. Nonetheless, Capt. McCulloch felt "compelled

14

to rely on the narrative in the arrest report to determine the events that occurred [that night]," [Doc. 12-1 at 1], despite the report being hearsay. Further, the report relied in large part on Officer Latham's summary of statements made by the Plaintiff, and Capt. McCulloch chose to rely on the report despite the Plaintiff's being at the hearing and directly disputing a number of the statements.

Accordingly, the Court finds that the Plaintiff also has a substantial likelihood of successfully proving the merits of her seventh cause of action, which, essentially, alleges that the decision made at the termination hearing was not based upon the preponderance of the evidence, as required by 24 C.F.R. § 982.553.

In this regard, the Plaintiff has argued that the criminal charges against her were "dismissed." The fact that the charges may have been dismissed, or that the charges even were filed, is not determinative of any issue in this matter. There is no rule, regulation, or statute which requires the MHA to wait for criminal charges to be brought, or for a conviction on criminal charges, before initiating the process to terminate a Section 8 program participant on the grounds of criminal activity. There are many reasons, unrelated to the guilt of the defendant, why a criminal charge may be dismissed, for example, absence of a witness or as part of a plea agreement. The MHA has the right, and obligation, to administer its Section 8 program independently of the operation of the state or federal criminal justice system.

**B.     Irreparable Harm**

Finding that the Plaintiff has a substantial likelihood of success on a number of her claims, the Court now turns to the issue of irreparable harm, the second criteria to be considered in an analysis of whether injunctive relief is appropriate. The Plaintiff alleges that, if injunctive relief is not issued in this case, she will suffer irreparable harm, because she and her two young children will be unable to pay their rent and will become homeless. The MHA counters that the Plaintiff does not

15

face an actual threat of homelessness, because her landlord has not threatened eviction and her parents have aided in paying her rent.

Other courts that have examined this question have concluded that "[t]he threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable injury, and satisfies the first prong of the test for preliminary injunctive relief." McNeill v. New York City Housing Auth., 719 F.Supp. 233, 254 (S.D.N.Y. 1989); see Baumgarten v. County of Suffolk, 2007 WL 1490482, at *5 (E.D.N.Y. May 15, 2007) (impending eviction and resulting homelessness constituted irreparable harm); see also Aguirre v. Aurora Housing Auth., 1991 WL 287109, at *5 (N.D. Ill. 1991) (finding "[t]here can be no doubt that [the prospect of an indigent mother of two young children losing her housing] constitutes irreparable harm for which there can be no adequate monetary compensation.")

Nonetheless, the Court recognizes that in the present case, testimony regarding the landlord's enforcement of the rent obligation and the aid from the Plaintiff's parents complicates the Court's analysis. The Plaintiff testified at the hearing that her parents have helped pay her current rent obligation for the last three months to prevent her eviction, but she also stated that, given their extremely low income, they could not aid her long. [Doc. 29 at 18-19]. In addition, the Plaintiff stated that her landlord, Mr. Hill, has not yet given her an eviction notice and has left her on a month-to-month lease because he knows about the ongoing litigation against the MHA. [Doc. 29 at 32]. As the Plaintiff pointed out, Mr. Hill has not yet had a reason to evict the Plaintiff, because her parents have paid her rent for the last few months.

While the generosity of others has prevented the Plaintiff and her children from being forced into homelessness while this litigation was undertaken, it appears to the Court that this generosity is quickly waning and will soon expire. To force Mr. Hill and the Plaintiff's parents to bear the cost

16

of subsidizing the Plaintiff's rent, to the extent such subsidy would even be possible going forward, would be an injustice considering the likely due process violations identified herein by the Court.

The Court agrees with the Defendant that the Plaintiff's testimony at the hearing may indicate that the amount of her subsidy should be revisited and reevaluated according to applicable HUD regulations. For example, it appears, based on the Plaintiff's "volunteer work," that she may be intentionally under-employed. She may also receive money or other support from friends, one of whom may or may not live with her. However, the current testimony before the Court is that the Plaintiff: earns three-hundred dollars per month [Doc. 29 at 4]; receives infrequent child support payments; and receives five-hundred dollars in food stamps per month [Doc. 29 at 5]. Given these income figures and finding that the Plaintiff's rent obligation is approximately five-hundred eighty-five dollars per month [Doc. 29 at 7, 23], the Court finds that, without a rent subsidy, the Plaintiff will be unable to meet her rent obligation and will face imminent eviction. See McNeill, 719 F.Supp. 233 at 254 (reasoning that without injunction a landlord will continue to seek the full rental obligation and since the plaintiffs, by definition, cannot afford to pay the full rent, they will face eviction).

Accordingly, the Court finds that the Plaintiff faces irreparable harm if injunctive relief is not given.

**C.      Substantial Harm to Others**

The Defendant maintains that awarding injunctive relief, in the form of a temporary voucher, to the Plaintiff would substantially harm others, specifically, other applicants on the waiting list to receive vouchers from the MHA. The MHA also argues that budget shortfalls are already straining the MHA budget and available resources. The Plaintiff maintains that she also waited in the years-long waiting list for a Section 8 voucher in the same way that the current applicants are having to

17

wait, and she maintains that granting the injunctive relief would not cause substantial harm to others, because it would restore the status quo rather than causing the deterioration of other applicants' situations.

The Court recognizes that public housing funds are not unlimited and that granting preliminary injunction in this case may require the MHA to set aside money to fulfill the Plaintiff's voucher. However, having examined the possible due process violations discussed above, the Court finds that it is quite possible that this injunction merely reinstates a status quo that, if not for the MHA's possibly improper termination of the Plaintiff's benefits, would have remained intact. That is to say, that all those applicants on the waiting list may simply be moved back to the spot in line where they would have been had the Plaintiff's subsidy not been terminated. Further, the Court notes that the trial of this matter is currently scheduled for November 9, 2009, so at most the MHA would be charged with subsidizing the Plaintiff for four or five months, pending the resolution of this case.

Weighing the possible due process violations by MHA and the Plaintiff's rights against the burden of temporarily reinstating the Plaintiff's benefits, the Court finds that granting injunctive relief will not result in substantial harm to others. See Litsey, 1999 WL 33604017, at *7 ("A preliminary injunction would harm the Housing Authority because it may be required to subsidize Plaintiff's Section 8 benefits from its own resources if the Section 8 certificate is already reassigned. However, considering the rights involved and the Housing Authority's presumed financial ability, this harm does not seem substantial.")

**D. Public Interest**

Finally, the Court concludes that the public interest would be served by the issuance of the injunction because it would protect the Plaintiff and her two young children from imminent danger

of eviction and homelessness. Moreover, the enforcement of due process rights is in the public interest. Aguirre, 1991 WL 287109, at *6; see Petties v. District of Columbia, 238 F. Supp. 2d 88, 99 (D.D.C. 2002) ("The public interest lies in . . . securing the due process rights . . . provided by statute.")

## IV. CONCLUSION

Based on the foregoing, the Court finds that the Plaintiff has demonstrated: a substantial likelihood of success on the merits; that irreparable injury will result without an injunction; that issuance of the injunction will not result in substantial harm to others; and that the public interest will be served by the issuance of the injunction. Accordingly, the Court finds that a preliminary injunction reinstating the Plaintiff's Section 8 voucher is appropriate pending resolution of this matter.

The Court will enter an order consistent with this Memorandum Opinion.

ENTER:

    s/ H. Bruce Guyton
United States Magistrate Judge